69 F.3d 532
 64 USLW 2335
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In re COMBAND TECHNOLOGIES, INCORPORATED, Debtor.
CRESTAR BANK, Plaintiff-Appellant,
v.
COMBAND TECHNOLOGIES, INCORPORATED, Defendant-Appellee,
and
United States Trustee, Party in Interest.
 No. 94-2181.
 United States Court of Appeals, Fourth Circuit.
 Argued: Sept. 27, 1995.
Decided: Nov. 2, 1995.
 
 ARGUED: Paul Kevin Campsen, KAUFMAN & CANOLES, Norfolk, Virginia, for Appellant. Stephen Gerard Test, CLARK & STANT, P.C., Virginia Beach, Virginia, for Appellee.
 Before MICHAEL and MOTZ, Circuit Judges and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Crestar Bank (the "bank") appeals a district court judgment that affirms the bankruptcy court's grant of the motion of the debtor-in-possession, Comband Technologies, Inc., to surcharge, under 11 U.S.C. Sec. 506(c), the bank's collateral. The bankruptcy court concluded that the surcharged expenses were required for the preservation and sale of the collateral (here, intellectual property). We affirm the surcharge for travel expenses charged to Comband's credit card and for other miscellaneous expenses (mileage, postage, etc.). However, we reverse the surcharge for the services of Comband's president, because the value of a debtor's labor is not a "cost" or "expense" under Sec. 506(c).
 
 I.
 
 2
 Comband was engaged in the high-technology communications business.
 
 
 3
 The bank renewed its $4 million credit line to Comband on September 6, 1990. In an Amended And Restated Security Agreement, Comband gave the bank a security interest in, among other things, Comband's "accounts, contract rights, chattel paper, instruments, general intangibles and other obligations of any kind ... arising out of or in connection with the sale or lease of goods or the rendering of services ..." (emphasis added). These items were called "receivables" in the agreement. Other covered items were called "inventory" and "equipment." Finally, Comband gave the bank a security interest in the "proceeds" of all collateral.
 
 
 4
 Comband owned certain patents, trademarks, and licenses ("intellectual property") necessary to its business. In a later dispute between the parties, Comband claimed that its intellectual property was not subject to the bank's lien. The specific issue was whether this property was a "general intangible" as that term was used in the security agreement.
 
 
 5
 As part of the financing arrangement, the bank required Comband's president, Robert E. Hoffman, to sign (in his individual capacity) a Performance Agreement, which required him to help the bank sell the collateral if Comband defaulted on its loan and the bank chose to foreclose. The agreement allowed Hoffman a small commission for his services to the bank.
 
 
 6
 Comband fell on hard times and filed a Chapter 11 bankruptcy petition on April 27, 1992. The next day, the bank filed motions for relief from the automatic stay and to prohibit Comband's use of cash collateral. On May 14, 1992, the bank and Comband presented an agreed order (entitled "Cash Collateral Order"), which was entered by the bankruptcy court and provided (1) that for the next 60 days, until July 14, 1992, Comband could conduct its business in the ordinary course, using cash collateral to pay its expenses and (2) that, on July 14, 1992, the bank would have relief from the automatic stay to pursue its remedies under the security agreement if Comband had not paid the bank by that date. In essence, Comband was given sixty days to sell the company and pay the bank from the proceeds of sale.
 
 
 7
 July 14, 1992, came and went, but the bank let Comband continue to operate. In August, a prospective buyer offered $1 million for Comband. At this point, Comband asserted that the bank's lien did not extend to the intellectual property and refused to certify that the bank had the right to convey that property. This development made the potential buyer skittish, and the deal fell through.
 
 
 8
 On September 21, 1992, the bank withdrew its consent to the cash collateral order under which Comband had been operating. At the same time the bank announced that it would liquidate its collateral and called upon Hoffman to fulfill his duties under the performance agreement. The bank also claimed that its lien extended to the intellectual property.
 
 
 9
 Three weeks later, on October 13, 1992, with no buyers on the horizon and the value of the intellectual property rapidly decreasing, Comband (by Hoffman) and the bank agreed that each would attempt to sell the intellectual property as soon as possible, leaving the dispute about the extent of the bank's lien to be resolved later.
 
 
 10
 Hoffman eventually found a buyer who agreed to buy Comband's intellectual property for $106,500. The bankruptcy court approved the sale at the end of January 1993. In November 1993, nine months later, the bankruptcy court determined that the bank's lien extended to the intellectual property. Comband, as debtor-in-possession, then filed a motion under 11 U.S.C. Sec. 506(c) to surcharge the proceeds of the sale of this property.* Comband sought (1) $25,106.28 in travel charges made on the company's American Express card that had been personally guaranteed by Hoffman; (2) $1,802.27 for various items such as mileage, postage, express mail, and telephone (the "miscellaneous expenses"); and (3) $13,065.00 for the value of Hoffman's services (217.75 hours at $60 per hour). Comband claimed that all of these items (totalling $39,973.55) were allowable costs and expenses incurred in selling the intellectual property, but the bank claimed that Comband was simply seeking reimbursement for normal operating expenses that were not surchargeable.
 
 
 11
 The bankruptcy court granted Comband's motion to surcharge collateral, awarding Comband $39,973.55 from the proceeds of the sale of the intellectual property. The district court affirmed, and the bank appeals.
 
 II.
 
 12
 The bank first argues that Comband did not have standing to make the surcharge motion because it was simply acting as a front for Hoffman. According to the bank, Hoffman was the real party in interest because if the motion was granted, he would not have to pay off (as guarantor) Comband's American Express bill and, in addition, would be paid for his services. Hoffman, like any other creditor of Comband, would lack standing to bring a Sec. 506(c) surcharge motion. In re JKJ Chevrolet, Inc., 26 F.3d 481 (4th Cir.1994).
 
 
 13
 We conclude that Comband had standing, as debtor-in-possession, to bring the surcharge motion under Sec. 506(c). Comband made and prosecuted the motion; Comband was liable for the American Express card charges (expenses) it sought to recover; and Comband alleged that these expenses were incurred to preserve and dispose of the bank's collateral. This was sufficient for Comband to meet the threshold for standing. Accordingly, the bankruptcy court did not err in denying the bank's motion to dismiss for lack of standing.
 
 III.
 
 14
 The bank next argues that the bankruptcy court erred in allowing surcharge because the expenses claimed by Comband do not meet the prerequisites under Sec. 506(c). We believe the American Express charges and the miscellaneous expenses qualify for surcharge.
 
 
 15
 A surcharge motion may be granted only if the expenses were "(1) necessary to preserve or dispose of the property; (2) of benefit to the secured creditor; and (3) reasonable." In re Bob Grissett Golf Shoppes, Inc., 50 B.R. 598, 602 (Bankr.E.D.Va.1985), on reconsideration, 76 B.R. 89 (1987). Whether a particular expense is necessary, reasonable, and of benefit to the secured creditor is a question of fact, and the bankruptcy court's findings may be overturned only if they are clearly erroneous. In re Bryson Properties, XVIII, 961 F.2d 496, 499 (4th Cir.), cert. denied, 113 S.Ct. 191 (1992).
 
 
 16
 The bulk of the $25,106.28 in American Express charges related to two business trips by Comband personnel: (1) a trip to China to complete the installation of previously sold equipment and (2) a trip to Orlando, Florida, to participate in a wireless cable TV trade show. The trips were authorized by the bank ahead of time. Indeed, the bankruptcy court found that all of the expenses, including the miscellaneous expenses, were incurred with the prior approval of the bank.
 
 
 17
 The bankruptcy court found that the expenses Comband sought through surcharge were reasonable and necessary to preserve "the operating integrity of the company," which, in turn, was required for a "successful sale" of the intellectual property. Thus, the court concluded, the expenses "directly benefited, as is required, strictly [the bank]."
 
 
 18
 A key fact in the bankruptcy court's analysis was the bank's prior approval of the expenses. According to the court, the bank could have sought immediate relief from the automatic stay, but instead it allowed Comband to incur these expenses. When the secured creditor consents to expenses being incurred, a strong presumption is created in favor of finding that Sec. 506(c) surcharge is proper. See In re Staunton Indus., Inc., 74 B.R. 501, 506-07 (Bankr.E.D.Mich.1987); Bob Grissett, 50 B.R. at 602.
 
 
 19
 The bank maintains that its consent is beside the point because the expenses were incurred solely to preserve the value of Comband as a going concern. Therefore, the bank argues, the expenses cannot be surcharged because they were neither "necessary" nor "beneficial" to the preservation or sale of the secured (intellectual) property.
 
 
 20
 Of course, Sec. 506(c) is an exception to the general rule that property subject to a security interest cannot be invaded to benefit the estate. See Textile Banking Co. v. Widener, 265 F.2d 446, 453 (4th Cir.1959); Bob Grissett, 50 B.R. at 602. And the bank correctly points out that expenses incurred to preserve the value of a business as a going concern are seldom necessary to protect the interest of a secured creditor. See, e.g., In re Codesco, Inc., 18 B.R. 225, 229 (Bankr.S.D.N.Y.1982). However, that an expense is seldom necessary does not mean that it is never necessary.
 
 
 21
 The intellectual property here included patents, trademarks and licenses. When the property subject to a security interest is intellectual property, preservation of the value of the business as a going concern can be essential (thus, necessary) to preserve the value of the property. Intellectual property cannot be mothballed until a buyer materializes. Often buyers can measure the value of intellectual property only by examining what cash flow that property is currently generating for the business. Moreover, the value of intellectual property can evaporate entirely if the business that owns the property stops operation. This possibility is especially real in the case of a trademark, which may be canceled for abandonment pursuant to 15 U.S.C. Sec. 1064(3). Thus, the bankruptcy court had an ample basis for finding that the American Express charges and the miscellaneous expenses helped "preserve the integrity of the company" and bring about the sale of the intellectual property.
 
 
 22
 Much of what made the expenses "necessary" also made them "beneficial" to the bank. This is a case where"[p]reservation of the going concern value of [the] business ... constitute[d] a benefit to the secured creditor." In re Hospitality, Ltd., 86 B.R. 59, 63 (Bankr.W.D.Pa.1988). The bank's claim of no benefit rings hollow here. In September 1992, with no buyers at hand and with the value of the intellectual property decreasing, the bank allowed Comband to keep operating with the understanding (1) that both Comband and the bank would try to sell the intellectual property and (2) that the lien dispute would be deferred. As the bankruptcy court put it, the bank could not say, "Let's get all the help that we can to realize all that we can," and then disclaim any benefit after Comband sold the property and the bankruptcy court ruled that the bank's lien attached to the sales proceeds.
 
 
 23
 Based on testimony and certain exhibits, the bankruptcy court found that the American Express charges and the miscellaneous expenses were reasonable. Nothing in the record allows us to set aside that determination.
 
 
 24
 In sum, the bankruptcy court's findings that the $25,106.28 in American Express charges and the $1,802.27 in miscellaneous expenses were necessary, of benefit to the bank and reasonable are not clearly erroneous.
 
 IV.
 
 25
 The bank also argues that none of the expenses sought by Comband are eligible for surcharge because Comband's president, Hoffman, had a duty under his performance agreement with the bank to help liquidate the property subject to the lien. We disagree. Even though Hoffman was an officer of Comband, he entered into the performance agreement in his personal capacity. Comband is not a party to the agreement, and the agreement cannot be used to block Comband from making a surcharge claim under Sec. 506(c).
 
 
 26
 We need not decide whether the performance agreement would preclude Comband from recovering for Hoffman's labor because we hold in the next part that the value of the labor of a debtor's officer cannot be recovered by surcharge under Sec. 506(c).
 
 V.
 
 27
 Finally, the bank argues that the bankruptcy court erred in surcharging the intellectual property sale proceeds for $13,065.00, representing the value of Hoffman's services. The bank is right on this point.
 
 
 28
 Courts have interpreted Sec. 506(c)'s use of the term "costs and expenses" as precluding surcharge for the value of a debtor's labor. See, e.g., In re Settles, 75 B.R. 229, 230-31 (Bankr.C.D.Ill.1987); In re Worrell, 59 B.R. 172, 174 (Bankr.C.D.Ill.1986); In re Air Center, Inc., 48 B.R. 693, 694 (Bankr.W.D.Okla.1985). See generally, Carlson, Secured Creditors and Expenses of Bankruptcy Administration, 70 N.C. L.Rev. 417, 467 n. 201 (1992) (collecting cases). We agree with this interpretation of the statute, and we hold that the value of the services of Comband's president, Hoffman, may not be surcharged under Sec. 506(c).
 
 VI.
 
 29
 The district court's judgment, entered September 1, 1994, is affirmed insofar as it operates to surcharge the collateral for the amount ($26,908.55) of Comband's American Express charges and miscellaneous expenses. The judgment is reversed insofar as it operates to surcharge the collateral for the value ($13,065.00) of Hoffman's services.
 
 AFFIRMED IN PART AND REVERSED IN PART
 
 
 *
 11 U.S.C. Sec. 506(c) provides, "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." The debtor-in-possession has the same right to bring a surcharge motion as does the trustee. 11 U.S.C. Sec. 1107